IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | : | |
| FIELD OF SCREAMS, LLC | : | |
| v. | : | Civil Action No. DKC 10-0327 |
| | : | |
| OLNEY BOYS AND GIRLS COMMUNITY SPORTS ASSOCIATION | : | |

**MEMORANDUM OPINION**

Presently pending in this trademark case is a motion to dismiss the amended complaint (ECF No. 50) filed by Defendant.[1] The issues are fully briefed and a hearing was held on September 2-3, 2010. For the reasons that follow, Defendant's motion to dismiss will be granted in part and denied in part.

**I.  Background**

**A.  Factual Background**

This is a case about two haunted attractions sharing a common name. One is in Pennsylvania. The other is in Maryland. Both purportedly involve activities such as "haunted hayrides and haunted houses." (ECF No. 44, Am. Compl. ¶ 70).

---

[1] Several other motions are also pending, including a motion for a preliminary injunction (ECF No. 46) filed by Plaintiff. This memorandum opinion addresses only Defendant's motion to dismiss, while a separate opinion addresses the three motions related to Plaintiff's request for a preliminary injunction.

### 1. The Pennsylvania Field of Screams

According to the amended complaint, Plaintiff Field of Screams, LLC owns and operates a "Halloween-themed haunted attraction and entertainment venue in Mountville, Pennsylvania" called "Field of Screams." (*Id.* ¶¶ 6, 8). The Pennsylvania-based Field of Screams is open each year in September, October, and sometimes November, with planning and preparations for the event taking place throughout the year. (*Id.* ¶ 10-11). Despite the name, which was adopted in 1993 (*id.* ¶ 8), the attraction involves much more than just a field. Indeed, as of 2009, Plaintiff's "family-run business" offered, among other things: a haunted hayride, a haunted barn, a "Little Screamers" children's event, a novelty store, an arcade, "interactive scare booths," food trailers, live bands, competitions and games,[2] and magicians. (*Id.* ¶¶ 7, 13).

Plaintiff's Field of Screams has earned the attention of mainstream and haunt-related media. In particular, the amended complaint indicates that the Pennsylvania Field of Screams has been featured on the Travel Channel and in "numerous nationally recognized haunted attraction industry trade magazines." (*Id.* ¶

---

[2]     Competitions included a battle of the bands, "Field of Screams Idol," a rap battle, "Field of Screams Guitar Hero," a skate competition, a wing-eating competition, a concert giveaway, and a "Snowboard Rail Jam." (ECF No. 44 ¶ 13).

14). The attraction has been "highlighted several times on the national radio broadcast," *The Howard Stern Show*. (*Id.*). Various "celebrities" have also visited, including Gunnar Hanson of *The Texas Chainsaw Massacre*, Stacy Kiebler, and Booker T. (*Id.*). In addition, *Hauntworld Magazine* rated the Pennsylvania Field of Screams a top "scream park/haunted hayride" (*id.* ¶ 15), and *The Baltimore Sun* featured the attraction in articles in 1999, 2000, 2001, and 2003 (*id.* ¶ 16).

Plaintiff further alleges that it has advertised extensively, spending "in excess of one million dollars over the years advertising and marketing its Field of Screams haunted attraction and entertainment venue and promoting the 'Field of Screams' name." (*Id.* ¶ 21). Using printed material, radio advertisements, and online advertisements, Plaintiff "extensively advertises and markets" its attraction throughout "the Mid-Atlantic Region," including Maryland, the District of Columbia, and Northern Virginia. (*Id.* ¶ 18). For example, Plaintiff advertises under the Pennsylvania, New Jersey, Maryland, and Delaware listings of the Hauntworld.com and HauntedHouse.com websites (*id.* ¶ 19), while also maintaining its own website where patrons may purchase tickets. (*Id.*). Since 1997, Plaintiff has advertised on at least one radio station reaching northern and central Maryland. (*Id.* ¶ 23). It has

distributed brochures[3] in northern Maryland since the same year (*Id.* ¶ 25), and has expanded its brochure distribution in subsequent years (*id.* ¶ 26). Brochure distribution has encompassed the Baltimore metro area since 1999.[4] (*Id.* ¶ 28).

According to Plaintiff, that advertising has paid off: "Plaintiff's business attracts tens of thousands of visitors from across the country each year." (*Id.* ¶ 17). In 2008, for example, "nearly 70,000 patrons" visited the Pennsylvania Field of Screams. (*Id.*). Vehicles in the parking lot displayed license plates from states such as Pennsylvania, Maryland, New Jersey, Delaware, New York, and Virginia. (*Id.*).

## 2. The Maryland Field of Screams

Defendant Olney Boys and Girls Community Sports Association operates its own Halloween-themed haunted attraction as an annual fundraiser in Olney, Maryland. (*Id.* ¶ 31). It too is called "Field of Screams" (*id.* ¶ 31), but Plaintiff characterizes Defendant's attraction as "a much lower quality

---

[3]    In 1999, Plaintiff began placing codes on its brochures and coupons to help it determine where its customers were coming from. (ECF No. 44, Am. Compl. ¶ 29). Plaintiff states that it "regularly receives coupons from the Maryland and District of Columbia regions." (*Id.*).

[4]    "In 1999, Plaintiff distributed 40,000 brochures in the Baltimore metro-region and points West and South, and 60,000 brochures in 2000, 2001, 2002, 2003, and 2004." (ECF No. 44, Am. Compl. ¶ 27).

attraction" (*id.* ¶ 40). Plaintiff alleges that Defendant began using the Field of Screams name in 2002, "almost a decade after Plaintiff's continuous use began" and five years after Plaintiff's first use in the Maryland and District of Columbia media markets. (*Id.* ¶¶ 33, 34). Defendant has continued using the name despite receiving a demand from Plaintiff to cease and desist. (*Id.* ¶¶ 32, 44-45).

###    3.    Alleged Confusion

Plaintiff alleges that Defendant's use of the Field of Screams mark has led to several instances of confusion. "Members of the public have accessed Defendant's website believing it was Plaintiff's website" and vice versa. (*Id.* ¶ 36). Some Maryland customers have contacted Plaintiff to book groups when they actually intended to reach Defendant's Field of Screams. (*Id.* ¶ 37). In 2009, for instance, a mother in Olney, Maryland sent a "birthday request" to Plaintiff's website "thinking it was the one for Defendant's annual event." (*Id.*). "On several occasions," patrons have purchased non-refundable tickets at Plaintiff's website believing that they were purchasing tickets for Defendant's attraction; they later sought refunds from Plaintiff. (*Id.* ¶ 38). Plaintiff has also received phone calls from confused patrons (apparently trying to

reach Defendant's venue) asking why directions were sending them towards Pennsylvania. (*Id.* ¶ 39).

## B. Procedural Background

Plaintiff originally filed a verified complaint on October 15, 2009 in the United States District Court for the Eastern District of Pennsylvania. (ECF No. 1). That complaint alleged six counts, including federal and Maryland trademark infringement and dilution, unjust enrichment, and unfair competition under Maryland and Pennsylvania law. (*Id.* ¶¶ 22-62). Each of these claims stemmed from Defendant's allegedly improper use of Plaintiff's senior mark. The complaint sought a judgment "in the amount of profits gained by Defendant through its use of Plaintiff's trademark" and an injunction barring Defendant from further use of the "Field of Screams" mark. (*Id.* ¶ 63). Plaintiff also sought a preliminary injunction. (ECF No. 3). Defendant filed a motion to dismiss just over a month later (ECF No. 19), which the court granted in part on January 12, 2010. (ECF No. 29). The case was then transferred to this court. (ECF No. 31).

Plaintiff filed an amended complaint alleging the same six counts on March 15, 2010 (ECF No. 44),[5] along with an amended

---

[5]    Plaintiff filed another amended complaint on March 29, 2010. (ECF No. 49). That complaint appears to be identical to

motion for a preliminary injunction (ECF No. 46). Defendant moved to dismiss the amended complaint on March 29, 2010. (ECF No. 50). After a requested delay from counsel, the court held a motions hearing on both Plaintiff's motion for a preliminary injunction and Defendant's motion to dismiss on September 2-3, 2010. Post-hearing briefing from both parties followed. (ECF Nos. 71 & 76).

## II. Analysis

### A.   Standard of Review

Defendant has moved to dismiss the amended complaint on two grounds:  lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted. The former is a bit of a misnomer, inasmuch as Defendant argues that there is no basis for the Pennsylvania state law claims and urges the court to decline to exercise subject matter jurisdiction over them. Thus, the primary thrust of the motion focuses on Federal Rule of Civil Procedure 12(b)(6).

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Except in certain specified cases, a

---

the one filed on March 15, which was apparently refiled simply to include a redlined version.

plaintiff's complaint need only satisfy the "simplified pleading standard" of Rule 8(a), *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).    Nevertheless, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 n.3 (2007).   That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (internal citations omitted).

In its determination, the court must consider all well-pled allegations in a complaint as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light most favorable to the plaintiff.   *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999)(citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)).   The court need not, however, accept unsupported legal allegations, *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Iqbal*, 129 S.Ct. at 1950, or conclusory factual allegations devoid of any reference to actual events, *United*

*Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979). *See also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not 'show[n] . . . that the pleader is entitled to relief.'" *Iqbal*, 129 S.Ct. at 1950 (quoting Fed.R.Civ.P. 8(a)(2)). Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

### B. Trademark Infringement and Unfair Competition

"[A] trademark not only protects the goodwill represented by particular marks, but also allows consumers readily to recognize products and their source, preventing consumer confusion between products and between sources of products." *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 392-93 (4th Cir. 2009). Plaintiff's principal contention is that Defendant has cultivated such confusion through its use of the "Field of Screams" mark. Defendant responds by arguing that Plaintiff's alleged mark is not protectable and Defendant's use of the mark is unlikely to cause confusion. (ECF No. 51, at 5-6).

The same standard applies to Plaintiff's claims for trademark infringement under both the Lanham Act and Maryland state law. *See Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 125 n.3 (4th Cir. 1990) ("We note that although the legal framework we here apply is derived from § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), Maryland law would provide the same framework."). The Lanham Act's approach is also the standard used for the Pennsylvania and Maryland state unfair competition claims. *Mun. Revenue Serv., Inc. v. Xspand, Inc.*, 700 F.Supp.2d 692, 702 n.11 (M.D.Pa. 2010) ("The common law cause of action for unfair competition in Pennsylvania mirrors the Lanham Act's section 43(a) cause of action for unfair competition." (quotations omitted)); *Sterling Acceptance Corp. v. Tommark, Inc.*, 227 F.Supp.2d 460, 461 (D.Md. 2002) (finding same under Maryland law). Thus, the viability of counts one, four, five, and six of Plaintiff's amended complaint hinges on the outcome of a single test: the now-familiar likelihood of confusion test.[6] To prevail under Section 43(a), a plaintiff must "first

---

[6] Plaintiff has not alleged that it registered the "Field of Screams" mark. Indeed, Defendant contends that someone else holds a federal registration for the mark. Nevertheless, Section 43(a) of the Lanham Act protects certain unregistered marks in addition to registered marks. *See MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 341 (4th Cir. 2001); *Ale House Mgmt., Inc. v. Raleigh Ale House*, 205 F.3d 137, 140 (4th Cir. 2000).

and most fundamentally prove that it has a valid and protectable mark." *U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 523 (4th Cir. 2002) (quoting *MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 341 (4th Cir. 2001)). The plaintiff must then show "that the defendant's use of an identical or similar mark is likely to cause confusion among consumers." *Id.* (citing *Perini*, 915 F.2d at 124).

### 1.   Protectability of the Mark

"Whether trademark protection extends to a proposed mark is tied to the mark's distinctiveness." *Retail Servs., Inc. v. Freebies Publ'g*, 364 F.3d 535, 538 (4th Cir. 2004); *Int'l Bancorp v. LLC Societe des Bains de Mer et du Cercle des Destrangers a Monaco*, 329 F.3d 359, 363 (4th Cir. 2003) (same). Courts measure a mark's distinctiveness along a spectrum that encompasses four broad categories:  generic marks, descriptive marks, suggestive marks, and arbitrary or fanciful marks. *See Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984); *see also George & Co.*, 575 F.3d at 393-94. A more distinctive mark enjoys more protection under trademark law.

"Generic words, which are the common name of a product or the genus of which the particular product is a species, can never be valid marks under any circumstances." *OBX-Stock, Inc. v. Bicast, Inc.*, 558 F.3d 334, 340 (4th Cir. 2009) (quotations

and citations omitted). For example, "crab house" would merit no protection when referring to restaurants that serve crabs, *Hunt Masters, Inc. v. Landry Seafood Rest., Inc.*, 240 F.3d 251, 254 (4th Cir. 2001), and "ale house" is generic when describing places where food and beer are served, *Ale House Mgmt.*, 205 F.3d at 141. Other examples of generic marks might be clear descriptors like bleach, copiers, cigarettes, and cars, *George & Co.*, 575 F.3d at 394, or slightly more oblique (but nevertheless obvious) marks like "LITE BEER" for light beer, *OBX-Stock*, 558 F.3d at 340. Trademark protections are not afforded to these marks "because, if a business were permitted to appropriate a generic word as its trademark, it would be difficult for competitors to market their own brands of the same product." *Cmty. First Bank v. Cmty. Banks*, 360 F.Supp.2d 716, 723 (D.Md. 2005) (quotations and citations omitted).

At the other end of the spectrum are arbitrary or fanciful marks. Such marks are considered inherently distinctive and receive "the greatest protection." *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 464 (4th Cir. 1996). "Fanciful marks . . . typically involve made-up words created for the sole purpose of serving as a trademark. Arbitrary marks . . . typically involve common words that have no connection with the actual product, as they do not suggest or describe any quality,

ingredient, or characteristic, so the mark can be viewed as arbitrarily assigned." *George & Co.*, 575 F.3d at 394 (citations and quotations omitted). The common thread between these two types is the lack of any discernible relationship between the mark and the product. Clorox, Kodak, Polaroid, and Exxon are good examples of fanciful marks, while Camel cigarettes and Apple computers exemplify arbitrary ones. *Id.*

Somewhere between arbitrary/fanciful marks and generic ones lie two additional categories: suggestive and descriptive marks. These two categories "are often difficult to distinguish from each other," *Retail Servs.*, 364 F.3d at 539, but some basic definitions are now widely agreed upon. "Descriptive marks merely describe a function, use, characteristic, size, or intended purpose of the product." *Retail Servs.*, 364 F.3d at 539 (quotations and citations omitted). Thus, "After Tan post-tanning lotion" and "5 minute glue" would be examples of descriptive marks. *George & Co.*, 575 F.3d at 394 (quoting *Sara Lee*, 81 F.3d at 464). In contrast, "[a] mark is suggestive if it *connotes*, without describing, some quality, ingredient, or characteristic of the product." *Retail Servs.*, 364 F.3d at 539 (quotations, citations, and brackets omitted; emphasis added). Examples of suggestive marks include L'Eggs pantyhose, Glass Doctor window repair, Coppertone sunscreen, and Orange Crush

13

orange drink. *Id.; OBX-Stock*, 558 F.3d at 340. The clearest way to distinguish between these two types of marks is to look to the manner in which the mark's message is conveyed: "if the mark imparts information directly, it is descriptive," but "[i]f it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive." *George & Co.*, 575 F.3d at 394 (quoting *Pizzeria Uno*, 747 F.2d at 1528).

The distinction between suggestive and descriptive marks is an important one, as suggestive marks are treated as inherently distinctive, while descriptive ones are not. *OBX-Stock*, 558 F.3d at 394. Descriptive marks are protected only if they have acquired secondary meaning, sometimes called acquired distinctiveness, which "is shorthand for saying that a descriptive mark *has become* sufficiently distinctive to establish a *mental association* in buyers' minds between the alleged mark and a single source of the product." *Retail Servs.*, 364 F.3d at 539. Coca-Cola has been frequently cited as the "paradigm of a descriptive mark that has acquired a secondary meaning." *Larsen v. Terk Techs. Corp.*, 151 F.3d 140, 148 n.7 (4th Cir. 1998).

Defendant makes three basic arguments for why Plaintiff's proposed mark is not legally valid and protectable. First, it

argues that Plaintiff is not the federally registered owner. Second, it notes that a "Google" search reveals "at least twenty other haunted attractions across the country that use the name 'Field of Screams.'" Third, it contends that the "Field of Screams" mark is not inherently distinctive and lacks secondary meaning.

Defendant's first two arguments rely on unsupported factual assertions not found in the complaint.[7] Such assertions are not properly considered on a motion to dismiss under Rule 12(b)(6). *See Bosinger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007) (noting that a district court is "forbidden" from considering "evidence outside the pleadings").[8] The third argument asks this court to resolve a question of fact at the motion to dismiss stage. *See, e.g., St. Luke's Cataract & Laser Inst., P.A. v.*

---

[7] The court does not mean to suggest that Defendant's arguments are entirely without merit – just that they cannot succeed at this stage based on the sparse assertions presented and properly considered. Third-party use and registrations are undoubtedly relevant. "The frequency of prior use of a mark's text in other marks, particularly in the same field of merchandise or service, illustrates the mark's lack of conceptual strength. A strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties." *Carefirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 270 (4th Cir. 2006) (citations, quotations, and brackets omitted).

[8] Nor is the court inclined to convert this motion to a motion for summary judgment at this stage.

15

*Sanderson*, 573 F.3d 1186, 1208 (11th Cir. 2009) ("Distinctiveness is a question of fact, whether the question is inherent distinctiveness or acquired distinctiveness." (quotations omitted)); *E.T. Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 192 (3[d] Cir. 2008) ("Courts of Appeals have generally held that a designation's level of inherent distinctiveness is a question of fact." (quotations omitted)); *see also Dayton Progress Corp. v. Lane Punch Corp.*, 917 F.2d 836, 839 (4th Cir. 1990) ("A district court's finding as to the category in which a mark belongs is reviewed under the clearly erroneous standard."). Even in the age of *Iqbal*, the court should not ordinarily decide such questions on a motion to dismiss.

Here, the amended complaint provides facts supporting the notion that the "Field of Screams" mark is suggestive, not merely descriptive. Contrary to Defendant's argument, the name does not "merely describe a function, use, characteristic, size, or intended purpose of the product." *Retail Servs.*, 364 F.3d at 539. The name does not flatly describe the venue because that venue is alleged to be more than a simple field; rather, it is allegedly an entertainment complex hosting a variety of entertainment. Although the word "Screams" draws the mark closer to the suggestive-descriptive line, it is not necessarily the case that the name would describe a Halloween-themed

16

attraction.  A "scream" might be a "shrill piercing cry, usually expressive of pain, alarm, or other sudden emotion." *Oxford English Dictionary* (2$^d$ ed. 1989).[9]  That cry might be elicited by any number of things unrelated to a Halloween-themed attraction (such as a rollercoaster, for instance).  A scream can also refer to "a cause of laughter; a very amusing person or situation."  *Id.*  Obviously, a field of laughter-producing entertainment is quite different from the "haunted" horrors found at Plaintiff's facility.  In short, it would appear some amount of imagination is necessary to deduce that a "Field of Screams" is a Halloween attraction – certainly as much imagination, for instance, as is needed to conclude that "Glass Doctor" refers to windshield repair.  *Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 172 (4th Cir. 2006) (finding "Glass Doctor" is suggestive mark as applied to repair and installation of glass and windshields).  Because the complaint pleads facts rendering it plausible that the mark is suggestive, there is no need to consider whether Plaintiff has alleged that the mark has acquired secondary meaning.

---

[9]     "Dictionary definitions can be very helpful in determining the commonly understood descriptive meaning of a word."  2 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 11:51 (4th ed. 2010).  The Fourth Circuit has also looked to dictionaries for assistance in categorizing a mark. *See, e.g.*, *Retail Servs., Inc.*, 364 F.3d at 544-45.

## 2.    Likelihood of Confusion

Defendant also maintains that Defendant's use of the "Field of Screams" mark is unlikely to cause confusion. (ECF No. 51, at 6). Defendant again relies on several facts not found in the complaint, including the existence of "twenty other attraction us[ing] the same name" and Defendant's lack of advertising in Pennsylvania. For the same reasons as before, the court will not consider these purported facts on a motion to dismiss.

Defendant does touch upon three reasons that can be properly considered. First, it observes that there is no allegation that Defendant is intentionally confusing the public. Second, Defendant notes that the two "Fields of Screams" are alleged to be of different quality. Third, Defendant adds that there is a "difference in geographic areas." None of these reasons support dismissal.

In determining whether there is a likelihood of confusion under the Lanham Act, courts in this circuit look at nine factors:

> (1) the strength or distinctiveness of the plaintiffs mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the

18

defendant's product; and (9) the sophistication of the consuming public.

*Georgia Pac. Consumer Prods., LP v. Von Drehle Corp.*, 618 F.3d 441, 454 (4th Cir. Aug. 10, 2010). "Not all of these factors are of equal importance" and sometimes particular factors will be irrelevant in a given case. *George & Co.*, 575 F.3d at 393 (quotations omitted). Actual confusion, however, is given special weight: it is "often paramount in the likelihood of confusion analysis." *Id.*

Likelihood of confusion is another factual issue ill-suited for resolution on a motion to dismiss. Nevertheless, the facts alleged in the complaint are sufficient to state a claim for relief. The complaint alleges that two similar businesses offering seasonal Halloween-related activities share a very similar mark – indeed, the words are identical. *See id.* at 396 ("[W]e focus on whether there exists a similarity in sight, sound, and meaning which would result in confusion."). As explained above, this mark sufficiently alleged to be inherently distinctive. While the complaint is devoid of facts describing Defendant's facilities or advertising, one could plausibly infer that these two similar businesses would use similar facilities and employ similar advertising techniques. All of these factors suggest a likelihood of confusion. The sophistication of the consuming audience is not relevant here. *Id.* at 400. ("[T]he

19

sophistication of the consuming public . . . will only be relevant when the relevant market is not the public at large." (quotations omitted)).

Two of Defendant's arguments speak to two of the remaining factors: Defendant's intent and the quality of Defendant's product. Defendant misunderstands their application, however. First, Plaintiff is not required to allege that the confusion is intentional; although intent to deceive "is strong evidence establishing likelihood of confusion . . . a good faith belief that a subsequently-adopted mark will not lead to confusion . . . is no defense if a court finds actual or likelihood of confusion." *Pizzeria Uno*, 747 F.2d at 1535.[10] Second, the fact that Plaintiff "states that Defendant's operation is not of the same quality as Plaintiff['s]" cuts in favor of *Plaintiff*, not Defendant. As the Fourth Circuit has explained:

> Consideration of the quality of the defendant's product is most appropriate in situations involving the production of cheap copies or knockoffs of a competitor's trademark-protected goods. If a defendant markets a product under a mark similar to that affixed by a competitor to a commodity of like nature but superior manufacture, that the defendant's product is markedly

_____

[10]    Moreover, Defendant's continuing use of the mark after receipt of a cease and desist letter might support an inference of bad faith. *See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 937 (4th Cir. 1995).

> inferior is likely to be highly probative of
> its reliance on the similarity of the two
> marks to generate undeserved sales.

*Sara Lee Corp.*, 81 F.3d at 467. This "knockoff" situation is *exactly* what Plaintiff alleges in the amended complaint. (ECF No. 44, Am. Compl. ¶ 40 ("Defendant's 'Field of Screams' attraction is regarded as a much lower quality attraction that Plaintiff's 'Field of Screams' attraction."). Thus, this factor also contributes to a sufficient allegation that there is a likelihood of confusion.

Finally, Plaintiff has alleged the most persuasive type of evidence: actual confusion. The amended complaint recounts that customers have purchased tickets from the wrong venue and made phone calls to one venue intending to call the other. *See, e.g.*, *Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*, 148 F.3d 417, 422 (4th Cir. 1998) (citing confused customer phone calls as evidence of actual confusion). The alleged presence of actual confusion, which is "determinative in many instances," *AMP Inc. v. Foy*, 540 F.2d 1181, 1186 n.8 (4th Cir. 1976), is certainly enough, in combination with the other factors listed above, to sustain this claim past the motion to dismiss stage.

### C. Trademark Dilution

Plaintiff has also brought two claims for dilution under the Lanham Act and a Pennsylvania state anti-dilution statute,

54 Pa.Cons.Stat. § 1124. Much like the trademark claims, resolution of both the state and the federal dilution claims depend on the same standard. *See World Wrestling Fed'n Entm't Inc. v. Big Dog Holdings, Inc.*, 280 F.Supp.2d 413, 443 (W.D.Pa. 2003) ("[T]he wording for the anti-dilution provisions of the Pennsylvania statutes is taken almost verbatim from the anti-dilution provision in the United States Code. Accordingly, there is no appreciable difference in the applicable standard." (citations omitted)).

To state a federal dilution claim – as Plaintiff attempts to do here – Plaintiff must show four elements:

> (1) that the plaintiff owns a famous mark that is distinctive; (2) that the defendant has commenced using a mark in commerce that allegedly is diluting the famous mark; (3) that a similarity between the defendant's mark and the famous mark gives rise to an association between the marks; and (4) that the association is likely to impair the distinctiveness of the famous mark or likely to harm the reputation of the famous mark.

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 264-65 (4th Cir. 2007). The only potentially relevant difference between the federal and Pennsylvania standards is the degree of fame that must be demonstrated. Under the federal statute, a plaintiff must establish that its mark is nationally famous and known to the "general consuming public of the United States." 15 U.S.C. § 1125(c)(2)(A). Under the Pennsylvania

statute, a plaintiff must show only that the mark has fame or notoriety within the Commonwealth of Pennsylvania, rather than the national market. *See* 54 Pa.Cons.Stat. § 1124. It is not enough to show that a mark is famous within one market in Pennsylvania. *See Maule v. Philadelphia Media Holdings, LLC*, -- F.Supp.2d --, No. 08-3357, 2008 WL 5251308, at *7 (E.D.Pa. Sept. 17, 2008) (noting requisite fame was not established because, *inter alia*, individual only demonstrated fame in Philadelphia market).

Defendant contends that Plaintiff's dilution claim must be dismissed for three reasons: (1) the mark is not inherently distinctive; (2) the mark is not famous; and (3) "Defendant has [not] targeted the same geographic area of Plaintiff such that it could dilute Plaintiff's mark."[11] (ECF No. 51, at 6-7). The court has already considered and rejected the first argument and no further discussion is necessary on that issue.

"A mark is 'famous' when it is 'widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner.'" *Louis*

---

[11] The third argument may be easily rebuffed. Plaintiff has alleged that its market includes the Maryland and District of Columbia markets, including Olney, Maryland. Thus, by operating within that area, Defendant certainly would have "targeted the same geographic area of Plaintiff," at least in part.

23

*Vuitton*, 507 F.3d at 264 (quoting 15 U.S.C. § 1125(c)(2)(A)). "The judicial consensus is that 'famous' is a rigorous standard." *Everest Capital Ltd. v. Everest Funds Mgmt., LLC*, 393 F.3d 755, 763 (8th Cir. 2005). The statute is meant to protect truly famous marks such as Dupont, Buick, and Kodak, *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 431 (2003), not every brand of local renown.

Here, Plaintiff has failed to plead sufficient facts to support the plausible inference that "Field of Screams" is a nationally famous mark. Indeed, Plaintiff concedes as much by alleging that the mark is "widely recognized within Plaintiff's geographic and marketing area." (ECF No. 44, Am. Compl. ¶ 71). Although Plaintiff pleads facts suggesting that its venue has received recognition in the "haunt" industry (and some sporadic attention in national forums), those facts do not indicate that, nationwide, the "general consuming public" would recognize the mark. *See* 15 U.S.C. § 1125(c)(2)(A). Fame in a "niche" market is no longer enough to support a claim under the Trademark Dilution Revision Act. *See, e.g.*, *Top Tobacco, L.P. v. N. Atl. Operating Co., Inc.*, 509 F.3d 380, 384 (7th Cir. 2007) ("[Section] 1125 . . . was amended in October 2006 to use 'the general public' as the benchmark. This change eliminated any possibility of 'niche fame,' which some courts had recognized

24

before the amendment."). Thus, Plaintiff's federal dilution claim will be dismissed.

There are enough facts, however, to support a plausible inference that the Plaintiff has a "famous" mark in the state of Pennsylvania. The extensive advertising in the region and the local media coverage have allegedly produced large crowds each year, suggesting the mark has indeed gained some recognition "throughout the Commonwealth of Pennsylvania and the surrounding geographic region." (ECF No. 44, Am. Compl. ¶ 79). Therefore, Plaintiff's state dilution claim will *not* be dismissed.

### D.   Pennsylvania State Law Claims

Finally, Defendant conclusorily contends that the court should not exercise supplemental jurisdiction over the Pennsylvania state law claims. (ECF No. 51, at 7-8). As Plaintiff notes, however, the court has *original* jurisdiction to hear the state law claims because the parties are diverse and the amount in controversy is alleged to be greater than $75,000. Even if the Pennsylvania state law claims were only before the court via supplemental jurisdiction, Defendant has not provided any explanation as to why the court should decline to exercise jurisdiction.

**III. Conclusion**

For the foregoing reasons, Defendant's motion to dismiss (ECF No. 50) will be granted in part and denied in part.  A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge