IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

:

FIELD OF SCREAMS, LLC                    :

    v.                                    :    Civil Action No. DKC 10-0327

:

OLNEY BOYS AND GIRLS
COMMUNITY SPORTS ASSOCIATION    :

**MEMORANDUM OPINION**

Presently pending in this trademark case is a motion for a preliminary injunction (ECF No. 46) filed by Plaintiff, as well as two related motions in limine (ECF Nos. 60, 65) filed by Plaintiff.[1]  The issues are fully briefed and a hearing was held on September 2-3, 2010.  For the reasons that follow, Plaintiff's motion for a preliminary injunction will be denied and both motions in limine will be denied.

**I.    Background**

    **A.    Factual Background**

This is a case about two haunted attractions sharing a common name.  One is in Pennsylvania.  The other is in Maryland.

---

[1]    A motion to dismiss (ECF No. 50) filed by Defendant was also pending.  This memorandum opinion addresses only the three motions related to Plaintiff's request for a preliminary injunction; a separate opinion resolves Defendant's motion to dismiss.

Both purportedly involve activities such as "haunted hayrides and haunted houses." (ECF No. 44, Am. Compl. ¶ 70).

## 1. The Pennsylvania Field of Screams

Plaintiff Field of Screams, LLC operates a Halloween-themed haunted attraction based in Mountville, Pennsylvania called "Field of Screams."[2] The Pennsylvania Field of Screams started in 1993 as a small hayride, run as a side business by brothers Gene and Jim Schopf. It has been called Field of Screams[3] since that time, and the brothers have used the same font and design (with "splash") to display the Field of Screams name from the beginning.[4] The Schopfs formed Field of Screams, LLC on August 14, 2006 by filing a Certificate of Organization with the Pennsylvania Secretary of State. (Def.'s Ex. 2).[5] Plaintiff remains a family-run business.

---

[2] The Pennsylvania Field of Screams is a member of the Haunted House Association ("HHA") and the International Association of Haunted Attractions ("IAHA"). (Pl.'s Exs. 2, 3).

[3] The name was suggested by a third individual.

[4] Plaintiff concedes, however, that it does not hold the federal trademark registration for the name "Field of Screams."

[5] The Schopfs also recently executed a Bill of Sale and LLC Operating Agreement transferring all assets related to the Pennsylvania Field of Screams to the LLC. (ECF No. 72 ¶ 5; ECF No. 72-1, at 4-40). Those documents have effective dates of August 14, 2006. (*Id.*).

The attraction is open to the public from mid-September through the first week in November, though preparations take place throughout the year. From its beginnings as a hayride, the attraction has since grown to incorporate a variety of activities spread over a 35-acre farm: the Den of Darkness (a haunted house), Frightmare Asylum (a haunted house),[6] and a haunted hayride through a cornfield. The attraction also hosts an entertainment area with two large stages, a novelty shop, ticket booths, five food trailers, a small game arcade, and four smaller stages.[7] Three full-time employees, part-time assistants, and roughly 400 volunteers (who assist in "scaring" and other activities) staff the operation. The Schopfs have invested substantial sums in developing the attraction.

Over the course of its existence, Plaintiff's Field of Screams has changed its target market. The enterprise initially targeted 12- to 18-year-old children for a $5 show. As the attraction has grown more sophisticated, however, the target market has expanded; Gene Schopf identified the attraction's

---

[6]    Plaintiff's two haunted houses host skits and shows, wherein actors and automatically-triggered machines would scare participants. The attractions incorporate computer-controlled scares, pyrotechnics, and more.

[7]    Various performances and competitions take place throughout the entertainment area, such as "battles of the bands," "rap battles," and other activities.

current target market as 12- to 60-year-old patrons for what is now a $25 attraction. Gene Schopf also characterized the venue's "target area" as the states of Pennsylvania, New Jersey, Maryland, and Delaware, or a "two hour radius" from Mountville.[8] Jim Schopf testified that the Schopfs began targeting the Baltimore and Philadelphia markets in 1999.

The Pennsylvania Field of Screams has spent more than $1.1 million advertising in various ways. (Pl.'s Ex. 26). Beginning in 1999, the Schopf brothers began preparing press kits that they distributed to radio stations, television stations, and newspapers. (*See* Pl.'s Ex. 3). They continue to prepare a press kit each year and have sent press kits to recipients in Maryland since at least 2001. Plaintiff has advertised on radio stations since 1998, primarily in Pennsylvania. (*See, e.g.*, Pl.'s Exs. 27, 31). It has hosted a media day to garner media coverage since the opening of the attraction. It uses billboards and floats. The venue also advertises on haunt-related websites.

In addition, Plaintiff maintains its own website for the attraction. (Pl.'s Ex. 18). Among other things on the website,

---

[8]     Patrick Konopelski, President of the IAHA and expert in the haunted attraction industry, concluded that a commercial haunted attraction like Plaintiff's Field of Screams could attract a "core customer base" willing to travel 2-3 hours.

patrons can purchase tickets and obtain directions from a number of locations.

Since 1993, Plaintiff has distributed brochures containing information such as directions and event descriptions, which also bear the "Field of Screams" logo. (*See, e.g.*, Pl.'s Ex. 2). These brochures are distributed as far as the Baltimore region, with 40,000 brochures purchased for distribution in that region in 1999, 60,000 brochures in 2002, and 245,000 brochures in 2009. (Pl.'s Exs. 21, 23). Christine Eshelman, an employee of Field of Screams responsible for brochure distribution, explained that she now targets areas within a two-hour radius of Lancaster, Pennsylvania. The distribution routes for the brochures have not encompassed, at any time, the District of Columbia or Olney, Maryland. (Pl.'s Ex. 22).

The brochures contain coupons that – at least since 1999 – have borne codes reflecting where the coupons were originally distributed (*e.g.*, "L" for Lancaster, Pennsylvania). These codes allow the Pennsylvania Field of Screams to track where redeemed coupons originated; in 1999, for instance, 172 coupons were redeemed from brochures originally distributed in the Baltimore region (out of 4,745 total brochure coupons redeemed). (Pl.'s Ex. 24). In 2002, 176 Baltimore-area coupons were

redeemed (out of 2,969 brochure total brochure coupons redeemed).[9] (*Id.*).

Plaintiff's advertising has apparently paid off and the business evolved. The attraction had an estimated 2,000 patrons in its first year, but drew 20,000 patrons by 1999. In 2008, more than 66,000 customers attended. (Pl.'s Ex. 24). Jim Schopf testified to seeing cars in the Pennsylvania Field of Screams parking lot from Pennsylvania, Maryland, New Jersey, and New York. An analysis of online ticket sales also revealed 16.6% of Plaintiff's customers who purchased tickets online between 2005 and 2009 have zip codes located within a thirty-mile radius of Olney, Maryland. (Pl.'s Ex. 37 ¶ 11).

Plaintiff's Field of Screams has also earned some attention from mainstream and haunt-related media. (*See* Pl.'s Exs. 6-18). Among other publications, Plaintiff's Field of Screams was covered in *Haunted Attractions* magazine, *Fright Times* magazine, *Haunt World* magazine, and *Scared Stiff* magazine. The Pennsylvania Field of Screams has been featured on the Travel Channel. (Pl.'s Ex 18). The attraction has been mentioned on *The Howard Stern Show*. Various "celebrities" have also visited,

---

[9]    Thus, if one extrapolates from the coupon figures, roughly 6% of Plaintiff's customers came from the Baltimore region in 2002.

including Gunnar Hanson of *The Texas Chainsaw Massacre*, Stacy Kiebler, Booker T, and (this year) Eddie Munster. *Hauntworld Magazine* also rated the Pennsylvania Field of Screams as a top "scream park/haunted hayride," and *The Baltimore Sun* featured the attraction in articles in 1999, 2000, and 2001. (Pl.'s Ex. 14-16). Based on this exposure, Plaintiff's expert[10] on the haunted attraction industry concluded that Plaintiff's Field of Screams is nationally recognized. (Defendant's expert disagreed, concluding that Plaintiff's "national media" exposure only went to those within the industry, not to consumers.)

## 2. The Maryland Field of Screams

Defendant Olney Boys and Girls Community Sports Association is a non-profit organization that provides athletic programs for children. Two full-time employees and more than 1,000 volunteers staff the organization. Started in 1969 with 123 children, the organization grew to 3,000 participants in 2000. After the organization opened a 118-acre park in 2002, it has since grown to 7,000 participants and 10 athletic programs. Defendant's work has earned it the Maryland Nonprofits Seal of Excellence and other awards.

---

[10] The expert, Konopelski, had some prior experience with Plaintiff. Konopelski owns his own haunted attraction that was originally named Field of Screams; he changed the name when the Schopfs asserted that they had used the name first.

Shortly after opening its new park in 2002, Defendant decided to develop a haunted attraction to generate revenue to support operations. In celebration of the organization's new "Field of Dreams" (*i.e.*, the park) (Def.'s Ex. 6), Defendant dubbed its haunted attraction the "Field of Screams." Defendant was not aware of the Pennsylvania Field of Screams when the name was chosen.

Defendant's Field of Screams started with a featured event: a haunted walk through the forest, wherein costumed volunteers spooked visitors. In 2006, Defendant expanded, adding a haunted hayride, a corn maze, and a two-story haunted house. Defendant also began employing professionals to do pyrotechnics, animatronics, makeup, and performances. Defendant invested substantial sums in improving the attraction. The attraction is open during the month of October, but preparations take place year-round.[11] The event now generates about 14.5% of Defendant's total budget each year.

Like Plaintiff, Defendant has an extensive marketing plan. Defendant markets on-site with signs and banners at its facility to its target audience: middle school and high school age

_____

[11]   Defendant's Executive Director Elizabeth Deal conceded that Plaintiff's and Defendant's attractions offer a similar experience.

facilities that use the park. It uses other advertising throughout Montgomery County and pays for advertising in the *Washington Post*, the *Rockville Gazette*, and the *Olney Gazette*. Defendant distributes one-page flyers at high school football games in Montgomery County and Howard County, as well as football games at George Mason University and the University of Maryland. Defendant also does "quite a bit" of radio advertising on two radio stations in Washington, D.C. Defendant established a website in 2006.[12] All of these advertisements "prominently say" that the attraction is in Olney, Maryland.

Defendant does not sell tickets to its Field of Screams online; instead, patrons may buy tickets in only one of two ways. Members of the Association may purchase discounted advance tickets through sponsors. The rest of the public must buy tickets at the gate.

Defendant collects certain information from patrons at its Field of Screams. In addition to signing a waiver warning patrons of potential dangers in the attraction, customers are asked to provide their zip code, their name, their address, and explain where they heard about the attraction. (Def.'s Ex. 7).

---

[12]    The front page of Defendant's Field of Screams website does not identify any association with the Olney Boys and Girls Community Sports Association, but it does identify the location of the attraction as Olney. (Pl.'s Ex. 20).

Using a sample of these waiver forms, Deal determined where customers to the Maryland Field of Screams were coming from. In 2007, "virtually nobody" came to the Maryland Field of Screams from Pennsylvania. (Def.'s Ex. 8). The same was true in 2008 and 2009, with only ten patrons coming from Pennsylvania in those years. (Def.'s Exs. 9, 10). Instead, most patrons come from Montgomery, Howard, and Prince George's Counties. Defendant's attraction is estimated to draw a few patrons from areas such as Frederick County, Anne Arundel County, and points in Virginia and the District of Columbia, in addition to some customers from the Baltimore area (425 in 2008 and 260 in 2009). (*Id.*).

Professor Thomas Maronick concluded that Defendant occupies an entirely different market than Plaintiff. Professor Maronick concluded that the two attractions draw from different geographic areas: Defendant's attraction draws from a geographic area south of Interstate 70 in Maryland (with a focus on middle and high school students), while Plaintiff draws from the York-Lancaster, Pennsylvania area (with a focus on middle school through adult consumers). Professor Maronick suggested there was a "huge area" between Defendant's market and Plaintiff's market that would render it "highly improbable" that a customer in Lancaster would attend the event in Olney. He

observed that younger patrons would not be able to travel very far, while older patrons would be unwilling to drive two or more hours to attend an attraction for 45 minutes – the amount of time he estimated patrons spent at haunted attractions.

In addition, Deal explained that forcing Defendant to change the name of its event would be "devastating." She estimated that at least $50,000 would be wasted if Defendant were forced to adopt a new mark.

### 3. Other Fields of Screams[13]

In addition to the two Fields of Screams attractions in this case, Defendant has introduced evidence of several other "Fields of Screams." The Chairman of Defendant's Board of Directors, Daniel Dionosio, said he was aware of 26 haunted events called "Field of Screams."[14] Dionosio explained that there were "pages and pages and pages" of references to the name in a Google search; a customer from Maryland confirmed that there were "a lot of" Field of Screams on a Google search, while Defendant's expert likewise agreed that there were 440,000

---

[13] Plaintiff has moved to exclude references to other entities or registrations using the name "Field of Screams." As will be explained below, such references are relevant and useful evidence in a case such as the present one.

[14] Plaintiff's expert was aware of two other attractions with the name.

Google hits from the name.  Neither Plaintiff nor Defendant holds a federally registered mark under the name "Field of Screams," although another party in Kentucky does.[15]  Field of Screams is also the name of a manual for setting up a haunted attraction.  (Pl.'s Ex. 5).

### 4.  Alleged Confusion

Plaintiff alleges that Defendant's use of the Field of Screams mark has led to instances of confusion.  Once, for instance, an actor at the Maryland Field of Screams mistakenly called Plaintiff's Field of Screams when he attempted to call in sick.  Gene Schopf also reported that there were "ticket mix-ups," wherein patrons purchased tickets from the wrong venue.  For example, a mother from Olney, Maryland mistakenly emailed the Pennsylvania Field of Screams and attempted to book a birthday party.  (Pl.'s Ex. 1).  Susan Jackson-Lee testified that she purchased tickets from Plaintiff's Field of Screams website thinking they were for Defendant's Field of Screams, as she "thought it was the parent company."  Sandra Schopf reported that she received several phone calls at the Pennsylvania Field of Screams meant for the Maryland Field of Screams.  Witnesses

_____

[15]  Even if not otherwise admissible, courts are free to take judicial notice of federal trademark registrations.  *In re Chippendales USA, Inc.*, 622 F.3d 1346, 1356 (Fed.Cir. 2010).

for Defendant stated that they were not aware of any patrons who mistakenly attended the Maryland attraction rather than the Pennsylvania attraction.

These instances of confusion led Plaintiff to send a cease and desist letter to Defendant on January 29, 2007. (Pl.'s Ex. 38). That letter reflects that Plaintiff was aware of at least two instances of confusion as of 2007. (*Id.*). Dionosio testified that Defendant responded to the letter with a request for more information, but did not receive any response from Plaintiff. When Defendant's counsel sent another letter to Plaintiff's counsel stating that it considered the matter dropped, Defendant received a response that the matter was not dropped. Defendant continued using the "Field of Screams" name. It did not hear anything else from Plaintiff until the filing of this lawsuit.

### B. Procedural Background

Plaintiff originally filed a verified complaint on October 15, 2009, in the United States District Court for the Eastern District of Pennsylvania. (ECF No. 1). That complaint alleged six counts, including federal and Maryland trademark infringement and dilution, unjust enrichment, and unfair competition under Maryland and Pennsylvania law. (*Id.* ¶¶ 22-62). Each of these claims stemmed from Defendant's allegedly

13

improper use of Plaintiff's senior mark. The complaint sought a judgment "in the amount of profits gained by Defendant through its use of Plaintiff's trademark" and an injunction barring Defendant from further using of the "Field of Screams" mark. (*Id.* ¶ 63). Plaintiff also sought a preliminary injunction. (ECF No. 3). Defendant filed a motion to dismiss just over a month later. (ECF No. 19), which the court granted in part on January 12, 2010. (ECF No. 29). The case was then transferred to this court. (ECF No. 31).

Plaintiff filed an amended complaint alleging the same six counts on March 15, 2010 (ECF No. 44),[16] along with an amended motion for a preliminary injunction (ECF No. 46). Defendant moved to dismiss the amended complaint on March 29, 2010. (ECF No. 50). After a requested delay from counsel, the court held a motions hearing on both Plaintiff's motion for a preliminary injunction and Defendant's motion to dismiss on September 2-3, 2010. Importantly, both parties agreed at that hearing that any preliminary injunction would only apply to the 2011 Halloween

---

[16] Plaintiff filed another amended complaint on March 29, 2010. (ECF No. 49). That complaint appears to be identical to the one filed on March 15, which was apparently refiled simply to include a redlined version.

14

season – not the 2010 season.[17]  Post-hearing briefing from both

parties then followed.  (ECF Nos. 71 & 76).

## II.  Analysis

### A.  Standard of Review

Plaintiff has moved for a preliminary injunction pursuant

to Federal Rule of Civil Procedure 65 and the Lanham Act.  (ECF

No. 46).  "A preliminary injunction is an extraordinary remedy."

*Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d

342, 345 (4th Cir. 2009), *vacated on other grounds by* 130 S.Ct.

2371 (2010) *and reissued in part*, 607 F.3d 355 (4th Cir. 2010).

To obtain a preliminary injunction, a plaintiff must establish

four elements:  "[1] that he is likely to succeed on the merits,

[2] that he is likely to suffer irreparable harm in the absence

of preliminary relief, [3] that the balance of equities tips in

his favor, and [4] that an injunction is in the public

---

[17]    This concession could be read as an acknowledgment
that Defendant would suffer substantial harm from the entry of a
preliminary injunction as to the then-current season.  The cost
of a name change in any season, however, could be substantial,
and Deal's comments that a name change could lead to a loss of
customers is supported by logic as well.  Plaintiff attempts to
dismiss these harms as "self-inflicted" (ECF No. 47, at 17), but
the Fourth Circuit has specifically cautioned that "it is error
for a district court to conclude that any harm that would be
suffered by a defendant was self-inflicted and thus entitled to
lesser weight in the balancing-of-the-harms portion of the
preliminary injunction calculus."  *Scotts Co. v. United Indus.
Corp.*, 315 F.3d 264, 285 (4th Cir. 2002).

15

interest." *Id.* at 364 (quoting *Winter v. Natural Res. Def.*
*Council, Inc.*, 129 S.Ct. 365, 374 (2008)). *All four*
*requirements* must be satisfied. *Id.*[18] Plaintiff suggests it is
entitled to a preliminary injunction because Defendant is
infringing and diluting its mark.[19]

**B.    Likelihood of Success**

The court must first consider Plaintiff's likelihood of
success on its infringement claim. To obtain a preliminary
injunction, Plaintiff bears the "heavy burden" of making a
"clear showing" that the claim will succeed. *Real Truth About*
*Obama*, 575 F.3d at 349. As explained in the prior decision on
Defendant's motion to dismiss, to prevail under Section 43(a) of
the Lanham Act, a plaintiff must "first and most fundamentally
prove that it has a valid and protectable mark." *U.S. Search,*
*LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 523 (4th Cir. 2002)

_____

[18]    Defendant cites several cases applying the "balance-
of-hardship" standard, which formerly applied in the Fourth
Circuit. *See generally Blackwelder Furniture Co. of Statesville*
*v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir. 1977). The Fourth
Circuit has more recently repudiated that standard, as it stands
in "fatal tension with the Supreme Court's 2008 decision in
*Winter*." *Real Truth About Obama*, 575 F.3d at 347 ("Because of
its differences with the *Winter* test, the *Blackwelder* balance-
of-hardship test may no longer be applied in granting or denying
preliminary injunctions in the Fourth Circuit.").

[19]    The court has dismissed Plaintiff's Lanham Act
dilution claim. Therefore, this decision will discuss only the
trademark infringement claim.

(quoting *MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 341 (4th Cir. 2001)).  The plaintiff must then show "that the defendant's use of an identical or similar mark is likely to cause confusion among consumers."  *Id.* (citing *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990)).  A review of the evidence reveals that Plaintiff "has not, at this preliminary stage in the litigation, made a clear showing that it is likely to succeed on the merits at trial, even though we do not decide the merits nor intend to foreclose any outcome on the merits."  *Real Truth About Obama*, 575 F.3d at 349.

Plaintiff must first establish that it owns a valid and protectable mark.  The court has already explained how trademark protection is established in its decision on the motion to dismiss, but a few basic principles are worth repeating here.  As the court noted before, "[w]hether trademark protection extends to a proposed mark is tied to the mark's distinctiveness."  *Retail Servs., Inc. v. Freebies Publ'g*, 364 F.3d 535, 538 (4th Cir. 2004); *Int'l Bancorp v. LLC Societe des Bains de Mer et du Cercle des Destrangers a Monaco*, 329 F.3d 359, 363 (4th Cir. 2003) (same).  Courts measure distinctiveness along a spectrum that encompasses four broad categories:  (1) generic marks, (2) descriptive marks, (3) suggestive marks, and (4) arbitrary or fanciful marks.  *See Pizzeria Uno Corp. v.*

*Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984); *see also George &*
*Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 393-94 (4th
Cir. 2009).

"Generic words, which are the common name of a product or
the genus of which the particular product is a species, can
never be valid marks under any circumstances." *OBX-Stock, Inc.*
*v. Bicast, Inc.*, 558 F.3d 334, 340 (4th Cir. 2009) (quotations
and citations omitted).  At the other end of the spectrum are
arbitrary or fanciful marks, which are considered inherently
distinctive and receive "the greatest protection." *Sara Lee*
*Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 464 (4th Cir. 1996).
"Fanciful marks . . . typically involve made-up words created
for the sole purpose of serving as a trademark.  Arbitrary marks
. . . typically involve common words that have no connection
with the actual product, as they do not suggest or describe any
quality, ingredient, or characteristic, so the mark can be
viewed as arbitrarily assigned." *George & Co.*, 575 F.3d at 394
(citations and quotations omitted).

Somewhere between arbitrary/fanciful marks and generic ones
lie two additional categories:  suggestive and descriptive
marks.  "Descriptive marks merely describe a function, use,
characteristic, size, or intended purpose of the product."
*Retail Servs.*, 364 F.3d at 539 (quotations and citations

18

omitted).  In contrast, "[a] mark is suggestive if it *connotes*, without describing, some quality, ingredient, or characteristic of the product."  *Retail Servs.*, 364 F.3d at 539 (quotations, citations, and brackets omitted; emphasis added).  Suggestive marks are treated as inherently distinctive, while descriptive ones are not.  *OBX-Stock*, 558 F.3d at 394.  Descriptive marks are protected only if they have acquired secondary meaning, which "is shorthand for saying that a descriptive mark *has become* sufficiently distinctive to establish a *mental association* in buyers' minds between the alleged mark and a single source of the product."  *Retail Servs.*, 364 F.3d at 539.

The name "Field of Screams" would appear to be suggestive. Although the name may evoke a sense of what the business relates to, the name does not actually *describe* a particular characteristic, function, or purpose of the product (*i.e.*, a haunted attraction) bearing the mark.  Thus, the name alone might lead one to label the mark as suggestive (and therefore inherently distinctive).

If the mark was merely descriptive, Plaintiff would need to prove secondary meaning, which it has failed to do.  "Proof of secondary meaning entails vigorous evidentiary requirements." *Perini*, 915 F.2d at 125 (quotations omitted).  The Fourth Circuit has provided six factors to consider in determining

whether a mark has secondary meaning: "(1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) sales success; (4) unsolicited media coverage of the product; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use." *Id.* at 125. None of these factors is determinative and not all six need to be favorable to Plaintiff. *B&J Enters., Ltd. v. Giordano*, 329 F.App'x. 411, 417 (4th Cir. 2009) (citing *Perini*, 915 F.2d at 125). Plaintiff must show secondary meaning "(1) in the defendant's trade area and (2) prior to the time when the defendant entered the market." *Perini*, 915 F.2d at 125-26.

Here, Plaintiff has not established that it will likely be successful in proving that its mark possesses secondary meaning in Defendant's trade area in 2002.[20] The evidence produced at the hearing reflects that Defendant's trade area is primarily Montgomery County, with a substantial focus on the region around Olney itself. Defendant's attendance surveys reflect that Defendant draws the substantial portions of its customers from that region and Defendant focuses its advertising efforts there. Any remaining efforts were primarily focused on points south,

---

[20] Plaintiff mistakenly looks to its own trade area, stating that "[t]he public within Plaintiff's geographic and marketing area associate the trademark with Plaintiff's haunted attraction and entertainment venue." (ECF No. 47, at 12-13).

near Washington, D.C. and Prince George's County.[21]   This southern Maryland market is also entirely consistent with the "45-minute drive time" market size posited by Professor Maronick for haunted attractions of Defendant's type.[22]   Therefore, given that Defendant's attraction started in 2002, Plaintiff would have to establish at trial that its mark had secondary meaning in the southern Maryland market before 2002.

It is unlikely that Plaintiff will be able to do so. Although Plaintiff has provided some evidence of advertising expenditures,[23] it has not provided any evidence that, as of 2002, the spending was directed at the southern Maryland market or that such spending was effective there.   *B&J Enters.*, 329

---

[21]   A much smaller number of customers were also drawn from points north, such as some parts of Howard County and the Baltimore area.

[22]   The court may, of course, take judicial notice of geographic realties.  "[G]eography has long been peculiarly susceptible to judicial notice."   *United States v. Bello*, 194 F.3d 18, 23 (1st Cir. 1999) (citations and brackets omitted); *see also, e.g.*, *United States v. Stewart*, No. 3:07cr51, 2007 WL 2437514, at *1 n.2 (E.D.Va. Aug. 22, 2007) (taking judicial notice of "facts gleaned from internet mapping tools"); *Jarman v. United States*, 219 F.Supp. 108, 112 (D.Md. 1963) (taking judicial notice of area encompassed by 75-mile radius from city).

[23]   Much of the advertising data provided is after 2002. Data relevant to secondary meaning coming *after* the appearance of the purportedly junior user is irrelevant.   *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 439 (3d Cir. 2000).

F.App'x at 419 ("Absent a showing that such expenditures were effective in causing the relevant group of consumers to associate the mark with itself, secondary meaning cannot be established." (quotations omitted)); *accord* 2 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 15:51 (4th ed. 2010) ("[T]he mere expenditure of money is not, in itself, determinative of the actual result in buyers' minds. From experience, we know that some forms of advertising are like 'water off the consumer's back,' and have no effect."). Indeed, one of Plaintiff's primary forms of advertising – brochures – were not distributed anywhere near Defendant's market during the relevant period. (Pl.'s Ex. 22). And the record suggests that Plaintiff's attraction received only a negligible number of patrons in 2002 from the closest region to Defendant where Plaintiff *did* market, Baltimore. (*See* Pl.'s Ex. 24 (listing only 176 coupons received from the Baltimore region)).

Admittedly, the Pennsylvania Field of Screams has enjoyed some sporadic national media attention via mentions on *The Howard Stern Show* and the Travel Channel. Similarly, Plaintiff's attraction was occasionally featured in *The Baltimore Sun*. Nevertheless, these intermittent appearances on the national and Maryland media scene are simply not enough to

establish a secondary meaning in the relevant Maryland market.[24]
Moreover, the Travel Channel's feature regarding Halloween-
related travel destinations does not demonstrate that potential
haunt patrons in southern Maryland would think that the Maryland
Field of Screams in Olney was in some way related to the
Pennsylvania Field of Screams. *Cf. Brennan's, Inc. v. Brennan's
Rest., LLC*, 360 F.3d 125, 132 (2$^d$ Cir. 2004) ("[V]irtually all
the articles and reviews discuss Brennan's New Orleans in the
context of the City of New Orleans or a trip to New Orleans.
This evidence in no way demonstrates that potential diners in
New York City who find the word Brennan's on a restaurant awning
will have any reason to think the restaurant is connected with
Brennan's New Orleans, or even will have heard of Brennan's New
Orleans."). As for Plaintiff's advertising in industry
publications and other participation in the haunt industry, such
specialized advertising is not directed "toward prospective
customers in any general sense," particularly customers in
southern Maryland. *U.S. Conference on Catholic Bishops v. Media
Research Ctr.*, 432 F.Supp.2d 616, 624 (E.D.Va. 2006) (finding

---

[24] Also, much of the press coverage apparently occurred
because the Schopfs began distributing press kits in 1999. It
is questionable then whether that coverage could be termed
"unsolicited."

attendance at industry conventions and publication in trade journals did not support finding of secondary meaning).[25]

Plaintiff has not produced a consumer survey. The absence of such evidence is "telling." *George & Co.*, 575 F.3d at 396. Although a survey is not required, "[s]urvey evidence is generally thought to be the most direct and persuasive way of establishing secondary meaning." *U.S. Search*, 300 F.3d at 526 n.13 (citing *Zatarins, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 795 (5th Cir. 1983). There is also no evidence of attempts to plagiarize the mark.[26] Similarly, although Plaintiff enjoyed strong sales in the past,[27] it has not brought forth

_____

[25] There is also no suggestion that Plaintiff's website was directed toward the southern Maryland market in 2002 and no information was provided about the origins of the website's users in 2002.

[26] Moreover, "[e]vidence of misdirected telephone calls to [Plaintiff] that were intended for [Defendant] does not constitute evidence of secondary meaning. If anything, it shows only that the public associates the name ["Field of Screams"] with [Defendant], *rather* than [Plaintiff]." *U.S. Search*, 300 F.3d at 526 n.11.

[27] Notably, Plaintiff submitted gross sales figures. The Fourth Circuit has distinguished between the usefulness of (1) simple gross figures and (2) a comparison between those gross revenues and the relevant market's total sales volume. *See B&J Enters.*, 329 F.App'x at 420. The latter is more useful because it allows the court to assess market penetration. *See* 2 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 15:49 (4th ed. 2010) ("Raw sales figures need to be put into context to have any meaning. That is, if a company says that its sales of goods or services under the mark are $x, that

24

evidence showing that the success stemmed from consumers in Defendant's area. The website zip code analysis does not apply to the relevant period (*i.e.*, pre-2002) and anecdotal evidence of license plates in a parking lot does not accurately reflect where customers are coming from.

As for continuous use, there has been substantial dispute over whether Plaintiff has continuously used the mark. For instance, Defendant contends that Plaintiff had no rights to the name "Field of Screams" prior to Plaintiff's legal formation in 2006. (ECF No. 76, at 7). Plaintiff produced evidence after the hearing that the Schopf brothers transferred the Field of Screams mark to Plaintiff via a Bill of Sale. (ECF No. 71, at 18). In light of that evidence, it is at least reasonable to believe that a jury would find that the use of the mark was continuous. *See Nat'l Bd. for Certification in Occupational Therapy, Inc. v. Am. Occupational Therapy Ass'n*, 24 F.Supp.2d 494, 500 (D.Md. 1998) ("A sale of a business and of its good will carries with it the sale of the trade-mark used in connection with the business, although not expressly mentioned in the instrument of sale." (quotations omitted)); *cf. Chien*

---

number cannot be said to be 'impressive' or 'persuasive' evidence of secondary meaning without knowing how $x compares with the norms of that industry.").

*Ming Huang v. Tzu Wei Chen Food Co. Ltd.*, 849 F.2d 1458, 1460 (Fed.Cir. 1988) ("[T]itle to the trademark passed upon incorporation."). Even so, Plaintiff has not provided evidence of continuous and exclusive use of the mark *in Defendant's market*. Moreover, even if the court considered Plaintiff's use of the mark since 1993, "length of time *alone* is insufficient to establish secondary meaning." *U.S. Search*, 300 F.3d at 526 n.12; *see also 815 Tonawanda Street Corp. v. Fay's Drug Co.*, 842 F.2d 643, 648 (2[d] Cir. 1988), *cited by B&J Enters.*, 329 F.App'x 411 (concluding mark had no secondary meaning even where there was "long and exclusive use" of mark).

In sum, "the record does not disclose that a substantial number of present or prospective customers" in the relevant Maryland market would associate "Field of Screams" with Plaintiff's attraction. *George & Co.*, 575 F.3d at 396. A mark that is not inherently distinctive and lacks secondary meaning, is not protectable.

Thus, Plaintiff's case at this stage depends on the purported "suggestive" nature of its mark. Even if Plaintiff has shown that its mark is inherently distinctive, however, it still needs to show likelihood of confusion in order to establish a trademark violation.

26

In that regard, a cold analysis of the words composing the mark does not resolve the likelihood of confusion issue:

> To determine if a likelihood of confusion exists, we look to (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; and (7) actual confusion. *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir.1984). Not all of these factors are of equal importance, "nor are they always relevant in any given case." *Anheuser-Busch*, 962 F.2d at 320. However, evidence of actual confusion is "often paramount" in the likelihood-of-confusion analysis, *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir.2001).

*CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 267-68 (4th Cir. 2006). The fact that a mark is suggestive does not establish that it is conceptually strong when there is significant third-party use of the mark, particularly in the same field. *CareFirst*, 434 F.3d at 269-70. Plaintiff actually moved to exclude evidence of third-party use of the "Field of Screams" name as irrelevant. (ECF Nos. 50, 60). The United States Court of Appeals for the Fourth Circuit, however, as stressed the significance of third-party use in this context. In *CareFirst*, for example, the court determined that a mark was not conceptually strong where the defendant produced extensive

evidence of third-party use, including "dozens of web page print-outs" from businesses in the same industry as the plaintiff. *CareFirst*, 434 F.3d at 270 (citing *U.S. Search*, 300 F.3d at 525). Here, there was evidence of significant third-party use, including 26 other haunted attractions and a trademark registration by another party. "If the [Field of Screams] mark were truly a distinctive term, it is unlikely that so many other businesses in the [haunt] industry would independently think of using the same mark or similar variants of it." *Id.*[28]

Nor, despite Plaintiff's efforts, has it shown actual confusion to the extent necessary to succeed. The evidence of anyone contacting one rather than the other site arises from use of the internet, where the users apparently were not careful in noticing the geographic location of the advertised entity. A patron who wanted to attend Defendant's Olney Field of Screams

---

[28] Given the above conclusions, Plaintiff's motions to exclude (ECF No.s 60, 65) will be denied. Defendant did not, however, properly authenticate and admit an item marked as Defendant's Exhibit 12. Therefore, the court chooses not rely on the contents of that exhibit. Defendant also objects to the consideration of several other items subjected as declarations attached to Plaintiff's post-hearing memorandum. Having reviewed the proffered exhibits and the objections thereto, the court will admit the declarations and the related exhibits, even though that evidence does not affect the court's ultimate conclusion.

did not realize that she had accessed Plaintiff's website, and an actor from Defendant's location attempted to call in sick using Plaintiff's contact information. Neither type of evidence shows that people are confused into thinking the two locations are the same; only that they were confused about what location they were contacting. There was no evidence that anyone ended up at Defendant's Olney location thinking it was Plaintiff's.

Given the findings of lack of conceptual strength and actual confusion, the fact that some of the other factors may be satisfied, such as the similarity of the marks or the general services provided, would not demonstrate likelihood of success. Plaintiff has not shown that it is likely to be successful on its claim for trademark violation.

### C. Other Preliminary Injunction Requirements

Because Plaintiff has failed to establish the first of the four preliminary injunction requirements, there is no need to discuss the remaining requirements. The court's decision not to chart its analysis on the remaining factors in full does not indicate that Plaintiff satisfied them. To the contrary, the court notes substantial problems for Plaintiff on each of the remaining factors, but no purpose would be served in addressing each in further detail.

## III. Conclusion

For the foregoing reasons, Plaintiff's motion for a preliminary injunction will be denied and both motions in limine will be denied.  A separate order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge